beginning with United States v. Ledezma-Cepeda and Mr. St. John. Thank you. I please the court, Judge Smith, Judge Wiener, Judge Willett. Judge Smith, I never had the privilege of arguing in front of you. I've read a lot of your opinions and have the highest regard for you, so I know our time is somewhat limited, so I'll try to be brief. I'm going to focus specifically on the issue of duress. I was actually one of the trial attorneys before the Honorable Terry Meads in Fort Worth on this cartel case, and I represented Ledezma-Cepeda. I know the court's read the record and understands the facts of the case, but briefly, not to use all my time up, my client was a Mexican national living in Monterey, had become a very successful private investigator, had dealt on drug busts and things like that, and he was actually recruited to help with a civil matter in a municipal issue in his hometown to help resolve that. And then at some point, the person that recruited him to come to Tarrant County in Southlake was a man named, his nickname, he went by Gato, that's not his formal name, but Gato was a member of the Beltron 11 organization, a very dangerous drug cartel in Mexico. And make no mistake about this, Your Honors, this case is not some hypothetical issue of threat. This is a real issue of concern my client had. My client was recruited by Gato, but he was also recruited in such a way that he was in fear of his life and the life of his family. The testimony clearly shows that he did participate in tracking down the and he did participate in tracking, put GPS on his vehicle, the Mercedes and the Rover, and was there at a coffee shop when two men in a Sequoia came by and killed Mr. Chapa. Specifically, there's testimony that occurred, let me start over, there's testimony that occurred during trial that my client and his son were in the entire store with different types of intimidation. My client did help track these men down, some men in Mexico and extraneous matter, but he was intimidated and in fear of his life. So more specifically, my question and my issue is to focus on, and Judge Means gave us a lot of leeway in the cross-examination of Gary Fleming, who was our expert, and the reason he was our expert is because he had actually infiltrated the cartel in Mexico. And so he had knowledge of what took place in there. He wasn't just someone who had heard about it. No, he wasn't a polished witness. No, he wasn't articulate. Some of his testimony is nothing that you would ever hear in terms of how he describes stuff. But specifically, Judge Means, under 704, limited a specific question, which I would suggest the court goes to an issue in the case, not the ultimate issue. Therefore, it was a question of fact for the jury to decide and not a question of law for Judge Means to rule on. So my specific concern is how Judge Means ruled as to a specific question asked by my co-counsel, Mr. Westball. And specifically, the question was, I know it's kind of a tight fit, Judge, Your Honors, but does someone in Mr. Ledesma's position have a reasonable opportunity to withdraw? Now, you could interpret that as being a question of law and not a question of fact, but I think as liberal as Judge Means was in allowing the testimony of Gary Fleming, I think that hurt our ability to establish by a preponderance of the evidence that our client was, in fact, in spirit for his life and was under duress. I think it took away the third prong and the four-prong test for the issue of duress. Specifically, in the court's charge, and like I said, Judge Means was gracious in giving it to us, a defendant's actions were justified and therefore he is not guilty, this is the question, only if that defendant has shown by preponderance of the evidence each of the following four elements, and the court has the four elements in front of it. Specifically, by limiting us to not ask that question, we could not prove, in my opinion, by preponderance of the evidence, that the fact was more likely than not to occur. I would suggest to the court that that is not a question of law. I guess the question of law would be did, more specifically, did Lopeda have the opportunity to withdraw or could he withdraw? I think that would be a question of law, and how Mr. Ball specifically asked it is, does someone in Mr. Ledatum's position have a reasonable opportunity to withdraw? I would suggest to the court that is not a question of law but a question of facts. All right. Thank you, and you've saved time for rebuttal, Mr. St. John. Mr. Winn. May it please the Court. This case for Mr. Ledesma was a lot different than the case for Mr. Lopeda. Mr. Lopeda's case came down to one pretty discreet issue, and it's whether he had the requisite mens rea at the time he did the acts that are undisputed. And we would submit to the court that this was a very close case on that issue, what was Mr. Lopeda's knowledge and intent at the time that he did the acts during what the government referred to as the stalking. Because that was such a close issue and because Mr. Lopeda's essential defense was that relying on his cousin who he knew to be a legitimate private investigator and believed to be endeavoring in a legitimate private investigation to find a white-collar criminal who had defrauded banks and other businesses in Mexico so that he could be brought to justice, when you saw the cascade of extraneous murders, there is no way a jury could be expected to make a reliable judgment on the relatively narrow issue in Mr. Lopeda's case. To start with, we would disagree strenuously with the government's characterization that the evidence in this case was overwhelming with regard to Mr. Lopeda. First off, Mr. Ledesma testified clearly, unequivocally, and repeatedly that he did not tell Mr. Lopeda the real reason they were looking for Chapa and, in fact, talked about the ruse that he used to get Mr. Lopeda to help him. And you would ask, why would Mr. Ledesma do this to his cousin? Well, the reason is, and he testified to it and so did his son, the cooperating witness, Mr. Campano, they didn't speak English. Mr. Cepeda was in the United States, a businessman who spoke English. He was someone they knew. They needed him because he gave them access to the United States in the form of someone that could literally walk into a clerk's office and speak English to the deputy clerks to gather up records. If you look at Mr. Cepeda's behavior, especially the testimony that came out during Mr. Cepeda's case, it is consistent with someone who is enamored with this idea that he's getting to play P.I. He talks about the trip to New York and they stayed in a nice hotel and they're looking for the cheating spouse and they talk about doing all these things. And you look at when they're in Florida and Mr. Campano testified about a conversation where Mr. Cepeda says, hey, I think stalking is illegal. I ought to get a P.I.'s license. And then they start having this conversation and Ledesma goes, yeah, you ought to get a P.I.'s license. This would be a real good business to be in here in the United States. We would submit that's indicative of someone who's not thinking I'm here trying to track somebody down for the cartel to do a murder. It's someone who thinks I'm an assistant to a legitimate private investigator and maybe I ought to be a legitimate private investigator. If you look at Campano's testimony, he never says he was given a deal by the government to testify. He never testifies about any conversation prior to the killing where he heard Ledesma, or excuse me, Cepeda, being told by Ledesma or anyone else this is a cartel deal and they're going to kill this guy when we find him. I assume you made all these arguments to the jury. Where do you think the jury went wrong in misunderstanding the evidence from your point of view? I don't think the jury could – I think you have to put this in the context of what the jury heard. They show up for jury service and they're told this is going to be anonymous. No one's going to know your names, including the lawyers. So if you're a jury, you're sitting there going, that seems weird. That's not how it works on TV. What do you mean they're not going to know my name? So then you get to opening statement. And what do you hear in opening statement? You hear something that sounds like it came straight out of a movie or a TV show about Chapo or somebody. In broad daylight, two hitmen from a Mexican cartel execute someone in the middle of an upscale shopping and restaurant district in South Lake, Texas. So you're already, as a jury, you're sitting there. And then the case starts and the government immediately, day one, starts talking about all these other murders. The discussion of the extraneous, it permeates throughout the trial. If you look, the trial lasts 15 days, calendar days, from the first day of evidence to closing argument. Nine days of that are testimony. Seven of the nine days, they're talking about these extraneous. The government says in its brief it's only 76 pages of testimony. They didn't include the three days of cross-examination of Ledesma where they got into this in depth. And look at what the jury, you couldn't expect them to separate it out. They didn't just hear in the abstract, oh, yeah, there are these extraneous murders. Pardon me for interrupting you, but are you going to get to the idea of severance? Yes, Your Honor. That's where I apologize. It's because all of this extraneous stuff came in that would have not been admissible against Cepeda or in an individual trial for Cepeda. It would have clouded, it did cloud the jury's judgment and make it impossible for them to separate out the evidence and make an individualized determination as to whether Cepeda really did have the culpable mental state at the time of the conduct. Weren't there some pretty careful instructions about that? Well, again, in the time we have here, we have tried to lay that all out in detail in our brief. You need to look at it how it actually happened in the trial from day one of the trial through the end. And what you see is you see instructions being administered here and there, and then you see at one point the judge overrules and doesn't instruct and other stuff comes in. You see repeated references to the extraneous going back and forth. We would submit to you that this is like McRae. In McRae, they had the instructions. In McRae, the lawyers stood up, and that was on the defendant's name was actually Warren. I mean, Warren's lawyers stood up and objected and got limiting instructions throughout that trial. And this court said this is one of those rare cases where the repeated limiting instructions are not sufficient. And we would submit that much like the situation in McRae, maybe it wasn't evident to the trial court, to the district court before trial that a severance was going to be needed. But as this trial went on and the jury was repeatedly shown the extraneous evidence, and again, it's not just in the abstract. I mean, they had one of the extraneous victim's brothers come who was a doctor and testify. He examined his brother's corpse and how he'd been tortured to death, and they showed pictures of it and everything else. It was not just in the abstract, well, this guy's done some other stuff. I mean, they went into gruesome details about it all and cross-examination in that regard. I'm sorry, Your Honor. I'm out of time. That's okay. Your opening time has expired and you've saved time for rebuttal. Thank you, Mr. Winn. Thank you. Ms. Hayworth. May it please the Court, Gail Hayworth on behalf of the United States. Now, this case can be easily resolved based on the deferential standards of review that governs the defendant's claims and the ample evidence supporting their guilt. Turning first to defendant number three, the cousin Cepeda. Cepeda bears a heavy burden in showing that the trial court abused its discretion in denying his motion to sever. He must show clear, specific, and compelling prejudice that resulted in an unfair trial and that the district courts during instructions were unable to protect him from. This he cannot do for three reasons. First, the evidence of his guilt was overwhelming. Second, the Rule 404B evidence against Ledesma was easily separated from Cepeda. And third, the district court repeatedly instructed the jury not to consider that Rule 404B evidence against Cepeda. Turning first to the evidence of guilt, of Cepeda's guilt. Cepeda admits that his mental state was the only real contested issue at trial. That is whether he acted with intent to kill, harass, or intimidate the victim with respect to count one or whether he acted with specific intent that the victim be murdered with respect to count two. Now there was more than enough evidence of Cepeda's intent with regard to both counts. First of all, Campagno testified that Cepeda knew that the intent and the purpose of the conspiracy was that the victim would be killed. Then there was e-mails showing that Cepeda knew that he was tracking a former cartel lawyer and also e-mails indicating that he knew that Ledesma was working for a cartel, not for a bank. Cepeda also repeatedly used false names during the course of the conspiracy and his intent can also be inferred from his continued stalking of the victim after they find him. Also, his intent can be inferred from the fact that he wanted Ledesma to remove the sticker of the decal identifier on the tracker that was placed on the victim's car just hours before the victim was killed because he was concerned that it could connect him to it and his intentional destruction of evidence after the victim was murdered. Perhaps most compelling of all was that after the murder, Cepeda did not act like a person who had been duped by his cousin into helping commit a murder. He did not go to the police. He did not cut ties with Ledesma. He didn't even really ask for an explanation. Rather, he continued to seek business with Ledesma. Cepeda does not dispute the deficiency of the evidence supporting count one and count two and he admits that there is no real contested issue with respect to his tampering conviction. Evidence alone which supports a strong inferential evidence of his culpable mental state. After all, why destroy evidence if it only shows that you have no idea that you were hired to help kill somebody? Now given the strength of the evidence showing his guilt, Cepeda fails to show that the Rule 404B evidence against Ledesma spilled over to him and denied him a fair trial. Moreover, the Rule 404B evidence was limited and easily separated from Cepeda. It made up only a small portion of the government's case-in-chief. By my estimation, six percent of the transcript of the government's case-in-chief. And by its nature, as extraneous acts committed by Ledesma outside the course of the conspiracy, it's easily separated from Cepeda. In fact, this circuit's view is that spillover prejudice is best avoided not by severance but by precise instructions to the jury, which is exactly what happened here. And this is true even when the evidence against the co-defendant involves serious or violent contact. In Harrelson, this Court rejected a severance argument based on a co-defendant's prior crimes, his evidence, reputation of being a murder-for-hire, and his generally unsavory character. What do you do with the Cortinas case? Cortinas is easily distinguishable here because it involves evidence that was not as easily separated because it was overwhelming testimony about intrinsic acts committed during the course of the conspiracy. Moreover, it didn't have the ample cautionary instructions that the district court did here. It involved two general cautionary instructions at the end of the court in the jury charge. The evidence here, almost every time it was admitted and every time the defendant asked for an instruction, the court always said, now remember, this evidence is only coming against Ledesma. You cannot consider it against Cepeda. So the instructions were much more cautionary in this case as well. Now, Cepeda also fails to point to a single instance of compelling prejudice. As explained in detail in the government's brief, he cites five instances that either misunderstand the record or rely on gigantic leaps of inference that are completely refuted by the record. He argues that the prosecution enlisted testimony that $8,000 was deposited into his account after a tracker was placed on Elizondo's driver. But the record actually shows that the testimony was that the money was deposited into Ledesma's account. He argues that the court gave the misimpression that he was wrong to object to Ledesma's notebook, but the record shows that the court actually just overruled the objection because the prosecutor agreed to move on. Now, turning to the defendant, number one, Ledesma's sufficiency claims. There was more overwhelming evidence of all of those elements, and I'll refer to my brief, since he didn't respond to them in his opening. And I'll respond directly to the duress argument. Now, in his brief, he does not argue that he proved duress, and therefore he has waived it. But moreover, even when he came up here and was arguing duress, he noticeably didn't go through any of the elements of duress, and that's because he cannot need it. Ledesma was not under an imminent or impending threat of death or serious bodily injury. He voluntarily joined Grupo Rudo. He was working for Gatto for years before he started searching for the victim here, and he was not afraid to disobey Gatto's orders when it suited him. Gatto told him don't cross the border after the victim's death, and he crossed the border. That's how he got arrested. And while searching for the victim in Florida, Gatto allowed him to take medical leave and come back so that he could have a surgery. All of that shows he was not under an imminent or impending threat from Gatto. Ledesma also negligently and recklessly placed himself in that situation. He voluntarily joined Grupo Rudo, and he was friends with Chico Malo and other leaders of the cartel. Ledesma also had a legal and reasonable alternative to killing Chapa. He could have informed the U.S. authorities or escaped across the U.S. border. He had a visa, and he had ability to cross the border anytime he wanted. He turned off his tracker. He went to a police station once. There was a police station close to South Lake. And it was also not reasonable to believe that tracking the victim would have alleviated the harm, as Ledesma had tracked other people for Gatto before this victim, and that apparently hadn't freed him from the threat. Turning to the other issue he raised about Gary Fleming's testimony. Now, he argues that the district court excluded or limited the testimony of his expert, but he fails to point to any part in the record that shows where the district court did so. And after searching through all of it, the only instance I found was the one he mentioned where the court sustained an objection under Rule 704, where the question is eliciting a legal conclusion. He fails to show any error, let alone plain error in that ruling, because his attorneys asked a question that elicited a legal conclusion. He asked, does anyone in Mr. Ledesma's position have a reasonable opportunity to withdraw? That closely mirrors the duress element, requiring the defendant to show that he had no reasonable opportunity to avoid the threatened harm. Moreover, even assuming that he can show that that was plain error in sustaining that objection, he fails to show that it affected his substantial rights, because not only was the evidence of his guilt overwhelming, but even with respect to this question, the court immediately allowed him to follow up with another question that elicited the same substance, but posed less of a danger of eliciting a legal conclusion. In particular, he allowed his lawyer to ask, in a general sense, without directing your attention to Mr. Ledesma, when a cartel gets a hold of someone, one of these expendables that they use lead to persuade, do these people have an opportunity to withdraw from cartel work? So he was able to get the same substance of what he needed to get. And it didn't affect his defense. Now, if the Court has no further questions, I'll defer to my brief and ask that, based on the overwhelming evidence of the defendant's guilt and the deference that is owed to the jury's verdict and to the district court's evidentiary rulings, this Court should affirm. All right. Thank you, Ms. Hayward. Mr. St. John, you've saved time for a vote. Thank you, Judge. Do you pronounce it St. John or St. John? I've heard it both ways. I've been to England, Your Honor, and they call me St. John, but from Fort Worth, Texas, I'm St. John. Thank you, Your Honor. I appreciate that very much. I know we've got two Texans up there and an honorable winner from the great state of Louisiana. I appreciate you letting me argue. I know my issue is narrow, but that's why we have brilliant appellate judges. I'm not trying to make you feel great about yourself, but this is an important issue. Let me tell you why. Gary Fleming is dead. I don't know if he was killed by the cartel, but he died in a single-car accident. That's not in the record, but I thought the court needs to know that. The court also needs to know we were surveilled during trial by cartel members from the Monterey. This idea that my client went under duress is insane. He was under duress, and the court can see in the record that Capone, his son, who testified against his father and his uncle did so to try to lessen his punishment, which he received a significant reward from Judge Means, I think 25 years in federal prison versus life without parole. The evidence is clear that the gang members tried to kill Capone in Mexico in a car accident. It's not some thing that my client made up that he was under duress. My client's family was under constant threat of intimidation and harm. My client's family didn't come to the trial because they were afraid to come to the trial. It's still an important issue for the jury, most respectfully, and I would suggest it is a fine line in reading the 704 and the Kerr-McGee case, which is not a criminal matter, but it's a civil matter. I want to reiterate the question Mr. Ball asked did not go to the ultimate issue. I want to reiterate it went to an important issue in the case that I think Judge Means, most respectfully, who I admire, made a mistake on and should allow that question to go to the jury and let the jury make that decision. The jury controls the outcome of the case. They control what the true facts are, not the attorneys and not Judge Means. So I know it's a close call. I'm not going to use all my time, but it's a very important issue to understand how dangerous these people were and how dangerous they are. Another one was arrested recently, I think in New Mexico. These folks are evil. These folks are dangerous. And a side note, which is not in the record, but I need to let the court know this. At one time, my front door was knocked on. My wife answered the door, and a man held up his cell phone to my wife and said, We're here to do tile work. We weren't having any tile work, but he showed my home address to my wife. Intimidation. All right. Thank you, Mr. St. John. Mr. Nguyen, you saved time for rebuttal as well. May it please the Court. I want to address a couple things from the record first. Ms. Hayworth is correct that I, in the course of writing this 20,000-word brief, I did mess up on the money going into Cepeda's account instead of Ledesma's. It was Ledesma's. But the important thing about that is Cepeda was with Ledesma. Why don't you afterwards, at your convenience, send us a one-page letter just making that correction? I will. What I would ask the Court to do, because of the limited time we have, is look carefully at pages 17 to 24 of our brief, where we lay out what the evidence about Cepeda's intent and knowledge was. And you'll see that what the government says is overwhelming. When you put it in terms of what did Cepeda know before the murder and what did he know after, much of the evidence that they say shows he had knowledge before the murder is conduct that occurred after the murder and is just as consistent, his behavior, with someone who thought he was doing something legitimate and then all of a sudden found out, I'm in the middle of a cartel hit. And this is bad for me. I need to get out of this. I guess what I would say is his post-murder conduct is just as consistent with him having innocent knowledge at the time of the murder as it is with him having guilty knowledge. The last thing I want to address is the proper remedy. As they point out, we have not challenged the sufficiency of the evidence on any issue. We have not argued about count three. But the question is, could Cepeda get a fair trial in this case under these circumstances? And we would submit that if he couldn't get a fair trial on counts one and two, he couldn't get a fair trial on count three. And we would also point out that in the event the Court believes that counts one and two should be reversed but count three shouldn't, under this Court's decision in McCrae that's been cited a few times since then, the proper remedy is to, at a minimum, reverse the sentence and send it back for resentencing in light of the new counts of conviction.  All right. Thank you, Mr. Wheeler. Thank you. Your case is under submission. And, Mr. St. John, we notice you're court-appointed. We wish to thank you for your willingness to take the appointment and for your good work on behalf of your client. Thank you. All right. Next case, Furlow v. Cage.